IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| THOMAS H. KNUTSEN, | ) | 4:05CV3177 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| JO ANNE B BARNHART, | ) | |
| COMMISSIONER of the SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

   This is a social security appeal.  Thomas A. Knutsen (Knutsen), a young man standing 6'4" and weighing 315 pounds, claims that he became totally disabled on account of back pain when he was 23 years old.  He asserts that the Administrative Law Judge (ALJ) failed to give his treating doctor's opinion appropriate deference and failed to properly evaluate his subjective complaints of pain.  As a result, he claims that the ALJ failed to properly assess his residual functional capacity.

   It true that Knutsen had a back problem that was successfully repaired by surgery.  It may also be true that he suffers some degree of back pain as a result of a post-surgical slip and fall.  However, and recognizing that Knutsen's own specialists could find no cause for his pain, and noting that several other factors tended to undermine Knutsen's credibility, the ALJ found that Knutsen was not disabled.  On this record, that decision was not erroneous.

## *I.  BACKGROUND*

   Knutsen was born March 19, 1978, and he has a high school education.  (Tr. 79, 144, 414.)  He filed his applications on September 19, 2002, alleging disability

since May 15, 2001, at age 23, due to back pain and a "blown disk in back." (Tr. 79, 138.)

### *Knutsen Hurts His Back, But Fully Recovers After Surgery*

A lumbar spine MRI on July 11, 2001, showed a broad posterior disc herniation with right caudal extension producing severe central canal stenosis and moderate right foraminal encroachment at L4-5. (Tr. 213.) It also showed mild bilateral L4-5 and moderate bilateral L5-S1 facet hypertrophy, noted as "surprising" for a person of Plaintiff's age. (Tr. 213.)

Plaintiff saw Gordon Porter, M.D., an orthopedic surgeon, on July 23, 2001, for an examination. (Tr. 287-88.) Plaintiff complained of pain in his back and occasionally in his right leg which began in June and worsened in July. (Tr. 287.) He worked on a pig farm and did a lot of heavy lifting. (Tr. 287.) He did not recall a specific injury or accident which led to his pain. (Tr. 287.) Based on that examination, Dr. Porter referred Plaintiff for surgical consultation with another colleague and, in the meantime, recommended no lifting, bending, straining, stooping, or anything other than activities of daily living and walking. (Tr. 288.)

Plaintiff saw Dr. Quentin Durward, a neurosurgeon, on August 27, 2001, and complained of worsening back and leg pain. (Tr. 283.) (Earlier, Dr. Jerry VandeBrug administered an epidural flood on August 20, 2001, on the recommendation of Dr. Durward. (Tr. 232.)) The surgeon recommended decompression and 360-degree fusion at L4-5, and discussed this with Plaintiff. (Tr. 284.) Dr. Durward noted that Plaintiff had normal discs above and below L4-5, and with an appropriate 50 pound lifting limit in the future, he was unlikely to "get into further trouble." (Tr. 284.) Plaintiff wanted to proceed with the surgery. (Tr. 284.) On August 31, 2001, Dr. Porter noted that he agreed with Dr. Durward's recommended surgical plan due to failed conservative treatment measures. (Tr. 282.)

On September 25, 2001, Dr. Porter and Dr. Durward performed surgery on Plaintiff's back at L4-5 consisting of a laminectomy and fusion. (Tr. 280-81.) Plaintiff was discharged on September 28, 2001. (Tr. 279.) Following surgery, Plaintiff did quite well, was ambulating with a brace, and did not experience any neurological impairment. (Tr. 279.)

On October 4, 2001, Dr. Porter noted that Plaintiff was "doing really well[,]" and was without right leg or foot pain. (Tr. 278.) The doctor told Plaintiff that he could sit for 30 to 45 minutes at a time and could drive for up to 30 minutes at a time. (Tr. 278.) Plaintiff was doing very well neurologically and straight leg raising was negative. (Tr. 278.)

Plaintiff saw Dr. Durward on October 29, 2001, and felt "extremely well." (Tr. 277.) His preoperative back pain was gone and he had no leg pain. (Tr. 277.) On examination, Plaintiff moved "around freely" and was not wearing his brace. (Tr. 277.) Straight leg raising was unrestricted. (Tr. 277.) X-rays showed excellent fusion at L4-5 with no evidence of hardware failure. (Tr. 277.) Dr. Durward reported excellent results so far and encouraged Plaintiff to still wear his brace. (Tr. 277.) He also recommended lifting no more than 15 pounds and to avoid bending at the waist. (Tr. 277.) Plaintiff could do some light chores within these restrictions. (Tr. 277.)

On December 26, 2001, Plaintiff was "feeling well[,]" had "no discomfort, no numbness, and no weakness in his lower extremities." (Tr. 275.) He did notice some tightness in his lower back. (Tr. 275.) Plaintiff had been wearing his brace and really felt well at this point. (Tr. 275.) Straight leg raising, back extension, and side bending were unrestricted. (Tr. 275.)

Dr. Durward noted that Knutsen had "none of his preoperative pain[,]" and he had "gotten a lot more active." (Tr. 275.) He was doing light work, replacing electric bulbs at the hog confinement barn. (Tr. 275.) Dr. Durward stated that he would let

Plaintiff work with a 25 pound lifting limit and no bending at the waist right now. (Tr. 275.)  In the long term, the doctor opined, he probably should have a 50 pound lifting limit. (Tr. 275.)

Plaintiff was seen at Pender Medical Clinic on January 16, 2002, for a preemployment physical. (Tr. 310.)  Dr. Matthew Felber[1] noted that Plaintiff was going to work as an activity assistant at Logan View. (Tr. 310.)  He had no problems or complaints, and the examination was within normal limits. (Tr. 310.)  Plaintiff was to do no heavy lifting or bending at the waist.  (Tr. 310.)

On January 21, 2002, Dr. Porter noted that Plaintiff had no further leg pain, minimal back pain, and was walking much better.  (Tr. 274.)  He was working on physical therapy and did not have any complaints.  (Tr. 274.)  Dr. Porter agreed with Dr. Durward's work restrictions at that time, and released Plaintiff to return to work. (Tr. 274.)

### *Shortly After Returning to Work, Knutsen Begins to Complain of Back Pain*

Plaintiff presented to the emergency room on April 2, 2002, with complaints of nausea and dizziness while at work.  (Tr. 221.)  Plaintiff moved all extremities spontaneously with full range of motion, and appeared to be neurologically intact. (Tr. 221.)  The doctor prescribed medication for nausea.  (Tr. 221.)

Plaintiff returned to the emergency room on April 14, 2002, after suffering a bout of vomiting and nausea.  (Tr. 218.)  He denied any headaches, chest pain, or

---

[1] There is no evidence that Dr. Felber is a specialist. On the contrary, given that the medical records reveal such things as doctor giving Knudsen an employment physical and treating a lacerated finger (Tr. 310), I assume that Dr. Felber is a general practitioner.

shortness of breath. (Tr. 218.) An examination was largely normal, gastroenteritis was assessed, and Plaintiff was prescribed medication. (Tr. 218.)

On April 17, 2002, Plaintiff reported that he fell on his right arm the previous night and had significant pain in his right wrist and some in his right forearm. (Tr. 308.) X-rays were negative. (Tr. 308.) A right wrist sprain was assessed and a splint was applied. (Tr. 308.) Ibuprofen and ice were recommended. (Tr. 308.)

Plaintiff presented to Pender Medical Clinic on May 14, 2002, complaining of some low back pain. (Tr. 307.) He had no numbness or weakness, but reported occasional tingling and pain in his legs which was worse with back extension. (Tr. 307.) He had no other complaints. (Tr. 307.) On examination, Plaintiff moved his extremities well, and muscle strength was 5/5. (Tr. 307.) Sensation was normal and straight leg raising was negative. (Tr. 307.) Dr. Felber assessed back pain, ordered an MRI, and prescribed pain medication. (Tr. 307.)

### *The Specialists Find No Objective Reason for the Back Pain*

An MRI of the lumbar spine on May 15, 2002, showed an epidural scar at L4-5 without identified reherniation of the disc, no spinal or foraminal stenosis, and unchanged facet arthropathy mentioned on an earlier report. (Tr. 212.) An MRI of the thoracic spine was normal. (Tr. 211.)

On June 3, 2002, Plaintiff saw Dr. Porter. (Tr. 273.) The doctor stated that he did "not have a real explanation" for Plaintiff's increasing pain based on his examination. (Tr. 273.) On June 20, 2002, Dr. Porter noted that an MRI did not show anything to explain Plaintiff's reported symptoms and the fusion appeared solid. (Tr. 272.) His last examination did not demonstrate any neurological deficits. (Tr. 272.) Despite that, Plaintiff stated that he could not work at that time. (Tr. 272.)

An electroneuromyography (EMG/NCV) was performed on July 3, 2002, due to the reported recurrence of pain extending down Plaintiff's legs. (Tr. 271.) The EMG/NCV study showed significant right paraspinal active denervation below the surgical site which may have been a postsurgical finding, or could suggest a new nerve root impingement. (Tr. 271.) There was slight reduction of nerve conduction amplitudes in the right L5 and S1 distributions which could suggest some old neurogenic injury, but a "needle examination showed no abnormalities in the lower extremity muscles tested." (Tr. 271.) Ultimately, the report concluded that "there was no clear evidence of recurrent radiculopathy or focal nerve compression." (Tr. 271.)

On July 19, 2002, physical therapy was planned for two to three times per week for four weeks. (Tr. 293.) Therapy was to consist of traction and exercise to increase lumbar range of motion and hamstring flexibility, and to increase abdominal strength and postural activities. (Tr. 293.) Dr. Bruce Keppen administered a caudal pouch and epidural steroid injection to Plaintiff's back on July 25, 2002. (Tr. 209.)

Plaintiff returned to see Dr. Durward on September 16, 2002, and stated that conservative treatment had given him no pain relief. (Tr. 267.) Dr. Durward noted that the previous thoracic MRI was totally normal, and the lumbar MRI was normal except for the fusion at L4-5. (Tr. 267.) The lumbar x-rays showed perfect fusion at L4-5. (Tr. 267.) Dr. Durward stated that Knutsen "should return to work now with a 50 pound lifting limit." (Tr. 267.)

In a letter addressed "To Whom It May Concern" dated January 27, 2003, Dr. Felber stated that Plaintiff did "fairly well" following surgery in September 2001, but had a recurrence of pain after a slip and fall in February 2002. (Tr. 303.) Dr. Felber stated that Plaintiff was unable to lift more than 25 to 30 pounds, and his low back pain affected him to the point that he was "unable to ride in a car or do any work," and was "really fairly unable to do anything at that time." (Tr. 303.)

An MRI of Plaintiff's right knee taken on May 28, 2003, showed torn medial collateral ligaments. (Tr. 350.) Other findings were basically normal. (Tr. 350.) Plaintiff saw Dr. Porter on June 23, 2003, regarding his knee. (Tr. 363.) Plaintiff reported problems with his knee the past eight or nine years with catching, clicking, and occasional giving way. (Tr. 363.) The doctor noted that the MRI suggested an old MCL injury, but intact ACL/PCL and menisci. (Tr. 363.) There was no major swelling of the knee. (Tr. 363.) On examination, Plaintiff walked without an antalgic gait and had good flexion of his knees. (Tr. 363.) There was full range of motion of the hips and intact straight leg raising. (Tr. 363.)

Dr. Porter stated that Plaintiff's knee condition was mainly a patellofemoral instability-like problem, and one that did not appear to be associated with any recent trauma. Perhaps Plaintiff had an MCL strain, but it was low grade and not associated with anything that would need intervention. (Tr. 363.) He recommended a course of conservative treatment. (Tr. 363.)

Plaintiff again saw Dr. Porter on August 25, 2003 regarding his knee, and reported that he had been a lot better with no swelling, no catching, no problems going up and down stairs, and not too much pain. (Tr. 362.) He was not wearing a brace at that time, and seemed to be fairly stable if he was not over-stressing things. (Tr. 362.) An examination showed good range of motion of his knee. (Tr. 362.) Dr. Porter recommended not doing anything further at this point. (Tr. 362.)

On October 27, 2003, Plaintiff complained of migraine headaches, but reported that he had noticed a great improvement with Relpax. (Tr. 370.) He also had a history of drainage down the back of his nose and sinus pressure. (Tr. 370.) A neurological exam showed no focal deficits. (Tr. 370.) Dr. Felber prescribed medications for sinusitis and headaches. (Tr. 370.) An MRI of Plaintiff's cervical spine was unremarkable. (Tr. 349.)

On January 27, 2004, Plaintiff saw Dr. H. Woodward at the Nebraska Spine Center for a consultative examination. (Tr. 347.) Plaintiff's upper and lower extremity motor function was normal, and Plaintiff was able to independently heel and toe walk, and do a deep knee bend without difficulty. (Tr. 347.) Hip flexion, abduction, and external rotation were negative for sacroiliac pain, and range of motion of the hips was normal. (Tr. 347.) Straight leg raise to 50 degrees caused low back pain. (Tr. 347.) Sensation was normal in the upper and lower extremities. (Tr. 347.) Dr. Woodward noted that a CT scan of the lumbar spine showed that his fusion appeared to be solidly healed. (Tr. 348.) Knutsen demonstrated no neurologic effects in physical examination. (Tr. 348.) Woodward wrote Dr. Felber that "I am unable to determine the source of his symptoms." (Tr. 376.) As a result, Dr. Woodward referred Plaintiff to Dr. James Devney, a physiatrist,[2] for further care. (Tr. 348.)

On March 1, 2004, Plaintiff saw Dr. Devney for low back pain. (Tr. 381.) Plaintiff reported 8/10 discomfort on average and 10/10 pain at the worst. (Tr. 381.) Examination showed Plaintiff ambulated independently and his gait was unremarkable. (Tr. 382.) Straight leg raising was negative while sitting. (Tr. 382.). There was diffuse tenderness involving the entire lumbosacral spine in a non-focal fashion. (Tr. 382.) Lumbar paravertebrals were supple without spasm. (Tr. 382.) He was able to toe, heel, and tandem walk without difficulty. (Tr. 382.) Manual motor testing demonstrated 5/5 strength to all lower extremity motor groups, and light touch was intact to all lower extremity dermatomal and peripheral nerve distributions. (Tr. 382.) Plaintiff wished to proceed with a bilateral L5-S1 transforaminal epidural for both diagnostic and perhaps therapeutic value. (Tr. 380, 382.) In short, Knutsen's "[b]ilateral lower extremity symptoms" were "of unclear etiology". (Tr. 382.)

---

[2]The internet tells me that this is a doctor who deals in physical medicine and rehabilitation.

Plaintiff returned to Dr. Devney on March 11, 2004, and reported complete symptomatic relief for only 24 hours following the epidural, but claimed that his symptoms then promptly returned. (Tr. 379.) On examination, he ambulated independently without device, and gait was unremarkable. (Tr. 379.)

On March 25, 2004, Plaintiff underwent nasal septal reconstruction, submucous resection of interior turbinate, and bilateral endoscopic maxillary antrostomy with tissue removal due to nasal airway obstruction secondary to deviated nasal septum, inferior turbinate hypertrophy, and bilateral chronic maxillary sinusitis. (Tr. 377-78.)

Dr. Devney saw Plaintiff again on April 8, 2004, and scheduled an L5-S1 facet block injection. (Tr. 333-34.) Plaintiff returned on April 22, 2004, and reported no relief from the latest injection. (Tr. 332.) He claimed that his pain was ongoing, and was averaged 8 to 9 (on a scale of 10) for discomfort. (Tr. 332.)

Plaintiff ambulated independently without assistance and his gait was unremarkable. (Tr. 332.) He transitioned without hesitation or facial grimace. (Tr. 332.) X-rays showed solid fusion at L4-5 and appropriately positioned and intact surgical hardware. (Tr. 332.) There appeared to be slight posterior translation at both L3-4 and L5-S1 on extension. (Tr. 332.)

Dr. Devney was stumped. "From an interventional perspective I do not have much more to offer." (Tr. 332.) So, Dr. Devney decided to send Knutsen back to Dr. Woodward for a further evaluation. If surgery was not required, Devney indicated a willingness to manage appropriate medications for Knutsen. (Tr. 332.)

In turn, Dr. Woodward returned Knutsen's care to Dr. Felber. (Tr. 375.) Woodward told Felber that the case was "somewhat complex." (Tr. 375.) He suggested that perhaps a discogram of the lumbar spine might be considered to determine if further surgical intervention was appropriate, but he added that surgery

was not then possible because Knutsen "needs to lose a large amount of weight before surgical treatment could be entertained." (Tr. 375.) Woodward's letter to Felber is dated May 11, 2004. (Tr. 375.)

### *Dr. Felber, the General Practitioner, Responds to Knutsen's Lawyer*

On May 4, 2004, Dr. Felber completed a questionnaire provided by Plaintiff's attorney entitled "Spinal Physical Capacity Questionnaire." (Tr. 383-88.) In answering the questions, the doctor indicated that Plaintiff's symptoms included reduced flexion, extension, and side bending, and tenderness. (Tr. 384.) According to the doctor, Knutsen experienced pain sufficiently severe to interfere with attention and concentration constantly, and his prognosis was poor. (Tr. 384.)

Dr. Felber further indicated that Plaintiff could walk only two blocks without rest or severe pain, could sit continuously for 20 minutes, stand continuously for 20 minutes, and sit, stand/walk for about two hours total in an eight-hour workday. (Tr. 385.) In addition, Plaintiff needed to alternate periods of walking during an eight-hour workday every 20 minutes for five minutes each time, and needed a job which permitted shifting positions at will from sitting, standing, or walking. (Tr. 385.) Dr. Felber also indicated that Plaintiff would sometimes need to lie down; could frequently lift or carry less than 10 pounds; and could occasionally lift 10 pounds and never lift more than 10 pounds. (Tr. 386.) Finally, Dr. Felber indicated that Plaintiff would be absent from work more than three times per month, could work less than two hours per day, and could work zero to three days per week. (Tr. 387.)

### *The Hearing Before the ALJ*

Plaintiff was represented by counsel and testified at the hearing, held on August 3, 2004. (Tr. 409-450.) Plaintiff stated that he was then 26 years old, stood 6'4", and weighed 315 pounds. (Tr. 413.) He testified that he was single, and had

a four-year-old son who lived with him. (Tr. 414, 433.) After discussing the various jobs he has held over the years (Tr. 414-423), Plaintiff then testified to his alleged disabling pain (Tr. 424-430). He stated that he was no longer taking any pain medication, and that his condition since ceasing all medications had remained the same. (Tr. 430.) Plaintiff described his daily activities (Tr. 430-435), and stated that he had sole responsibility for the care of his child (Tr. 433).

A vocational expert was present and testified. The ALJ told the VE to assume that the plaintiff could perform the weight lifting requirements of light work,[3] but he (1) needed to alternate between sitting and standing at will; (2) needed to avoid heights; (3) needed to avoid repetitive twisting or bending at the waist; (4) needed to follow certain postural restrictions such as no crawling, kneeling, or stooping; (5) needed to only occasional use ramps or stairs; (6) needed to avoid concentrated exposure to vibrations; and (7) possessed only elementary school academic skills. (Tr. 438, 440-441, 445.)

The VE stated that with the physical and educational limitations suggested by the ALJ, Plaintiff could not return to his past work. But the VE also stated that Knutsen could perform other work found in the national and regional economies, such as grader and sorter of agricultural products, conveyor belt package sorter, and inspector and tester. (Tr. 437-449.)

### *The ALJ's Written Decision*

The ALJ found that Knutsen suffered from chronic low back pain following back surgery and that this problem was "severe." (Tr. 27.) Nevertheless, and

---

[3]According to the ALJ, this meant lifting no more than 20 pounds at a time, with frequent lifting of up to 10 pounds permitted. (Tr. 26.)

although Knutsen could not return to his past relevant work, he could perform "slightly less than the full range of light work." (Tr. 27.)

As a result, Knutsen was not disabled because there were a sufficient number of jobs in the national economy that he could perform after considering all of his legitimate impairments. (Tr. 27-28.) For this decision, the ALJ relied upon the testimony of the VE. (Tr. 26-27.)

The ALJ rejected several of Dr. Felber's most limiting opinions about Knutsen's residual functional capacity because Felber's opinions were inconsistent with "claimant's own specialist" and because of "Dr. Felber's failure to cite any specific objective evidence to support the extreme restrictions . . . ." (Tr. 25.) The ALJ also expressly discounted Knutsen's account of totally disabling pain[4] and gave reasons for this decision. (Tr. 23-25.)

## II. ANALYSIS

Knutsen essentially argues that the ALJ improperly discounted the opinions of Dr. Felber and the ALJ wrongly depreciated Plaintiff's credibility. As a result of these errors, Knutsen also claims that ALJ arrived at a residual functional capacity assessment that was erroneous. I am not persuaded by any of these three arguments.

First, a "treating physician's opinion is due 'controlling weight' if that opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001) (quoting Prosch v. Apfel, 201 F.3d

---

[4] He found the claim "somewhat exaggerated when taken as whole." (Tr. 23.)

1010, 1012-13 (2000) (emphasis added).)  However, a "treating physician's opinion 'do[es] not automatically control, since the record must be evaluated as a whole.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir.1995).  In this regard, an ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence . . . ."  Prosch, 201 F.3d at 1013.

Here, Dr. Felber's opinions were not "well-supported." They were also inconsistent with the opinions of other treating doctors who were specialists. Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005) (In social security disability benefits case, opinions of specialists on issues within their areas of expertise are generally entitled to more weight than opinions of non-specialists.)

For example, despite tons of very expensive tests, Felber had no objective data to support his opinion that Knutsen actually suffered from totally disabling pain.  On the other hand, Dr. Woodward, a specialist who treated Knutsen, looked at the tests and the objective data produced by them, but was "unable to determine the source of his symptoms."  (Tr. 376. )

Likewise, Dr. James Devney, another specialist who treated Knutsen, dryly observed that Plaintiff's pain claim was based upon an "unclear etiology." (Tr. 382.) Dr. Porter, another specialist, did "not have a real explanation" for Plaintiff's pain (Tr. 273) and an MRI did not show anything "to explain his symptoms" (Tr. 272-73). Even further, Dr. Durward, another treating specialist, concluded, after reviewing MRI studies of the spine and considering Plaintiff's "ongoing back pain[,]" that Knutsen "should return now to work with a 50 pound lifting limit."  (Tr.  267.)

In summary, the ALJ did not legally err when he decided to reject some of Dr. Felber's most limiting responses to the lawyer's questionnaire.  On the contrary, the

ALJ utilized factors approved by the Court of Appeals to arrive at his opinion about the strength of the doctor's opinion.

Second, while an "ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them[,]" the "ALJ may disbelieve subjective complaints 'if there are inconsistencies in the evidence as a whole.'" Goff, 421 F.3d at 792 (In evaluating claim for social security disability benefits, ALJ did not improperly discount claimant's allegations of severe and disabling pain by finding that claimant's medical condition caused some pain and limitations, but that claimant's subjective complaints were not fully credible and were not as limiting as she alleged) (internal citations omitted).  Thus, on appeal, a judge should "'not disturb the decision of an ALJ who considers, but for good cause expressly discredits, a claimant's complaints of disabling pain.'" Id. (quoting Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001).

In this case, the ALJ did not discount Plaintiff's credibility solely because of a lack of objective medical evidence.  While it is certainly true, as noted by the ALJ, that there was a startling lack of objective medical evidence to confirm Knutsen's claim of totally disabling pain and this was true despite numerous and repeated tests reviewed by four qualified experts, the ALJ relied upon several other inconsistencies.

These inconsistencies included the fact that Knutsen testified that he could (with a "laundry list" of limitations) shower, walk downstairs, fix breakfast, act as the sole caretaker for his young son, shop for necessities, visit friends, and mow the lawn.[5]  (Tr. 24.)  The litany of inconsistencies also included the fact that, despite the complaint of totally disabling pain, Knutsen had been off medications for three

---

[5]Knutsen testified that he has a large lawn, consisting of about "half a block." (Tr. 434.)  The lawn took Knutsen "between four and five hours" to mow using "a push mower and a riding mower."  (Tr. 434.)

-14-

months at the time of the hearing (Tr. 24) and, according to Knutsen, the absence of pain medication made absolutely no difference.[6] (Tr. 430.)

Still further, the ALJ observed that even thought Plaintiff received a wide variety of treatments (such as injections, nerve blocks, and physical therapy), Knutsen claimed to have received little or no pain relief from those ministrations. (Tr. 24-25.) Significantly, and despite the fact that all of the medical records from the surgeons indicated that his back surgery had been a complete success and Plaintiff had been relieved of his preoperative pain as a result of that surgery (e.g., Tr. 275), Knutsen inexplicably told the ALJ that he had received only a "little bit of" relief from his surgery. (Tr. 429.) Thus, it was not surprising that the ALJ expressly concluded that Knutsen's pain testimony was "somewhat exaggerated when taken as whole." (Tr. 23.)

To the extent that Knutsen argues that the ALJ did not tediously detail every factor that might bear upon the claimant's credibility when writing his opinion, such an argument misses the point. So long as the ALJ gives sound reasons for rejecting the credibility of a social security claimant, and the ALJ shows an awareness of the factors raised by the record that must be considered in the courts of this Circuit when assessing credibility, there is no requirement that ALJ elaborate on each such consideration. See, e.g., Lowe v. Apfel, 226 F.3d 969, 971-72 (8th Cir. 2000) ("The ALJ was not required to discuss methodically each Polaski[7] consideration, so long as he acknowledged and examined those considerations before discounting [the claimant's] subjective complaints.") Taking into account the entirety of the ALJ's

---

[6]Even though Knutsen told the ALJ that he had been given "one of the strongest meds that they could give me[,]" Knutsen also claimed that this powerful drug afforded him absolutely no pain relief. (Tr. 428.)

[7]Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (setting forth factors that bear upon credibility and must be considered).

written opinion, I am satisfied that the ALJ was aware of, and considered, all of the relevant factors even though the plaintiff desires greater detail.

Finally, Knutsen seems to claim that the ALJ substituted his medical judgment for that of Dr. Felber when the judge set forth his views on the claimant's residual functional capacity. I disagree. While it is true that the ALJ rejected the extreme limitations proposed by Dr. Felber, the residual functional capacity that the ALJ settled upon tracked the opinions of the surgeons. For example, three months after the surgery, Dr. Durward stated that he would let Plaintiff continue to do light work with initial limitations of lifting no more than 25 pounds and no bending at the waist. (Tr. 275). In short, the ALJ did not practice medicine without a license.

### III.  CONCLUSION

When a big, strong and young man has a back problem that is successfully repaired, and yet he complains of totally disabling back pain despite objective testing that fails to confirm a medical cause for the pain, the law allows the ALJ to rely upon the views of the experts rather than the views of a general practitioner and the law also allows the ALJ to decide the case based upon the claimant's lack of credibility. While I might I have come to a different conclusion, the ALJ's decision was supported by substantial evidence and it was not legally erroneous. Therefore,

IT IS ORDERED that Knutsen's appeal is denied and the decision of the Commissioner is affirmed. A separate judgment will be entered.

May 26, 2006.                               BY THE COURT:

                                            s/Richard G. Kopf
                                            United States District Judge